THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* KENNETH WINFIELD, Defendant-Appellant.

First District (5th Division)   No. 81—2585

Opinion filed March 31, 1983.

Steven Clark, of State Appellate Defender's Office, of Chicago, and Jeffrey E. Schiller, Francis M. Pawlak, and Jan Feldman, all of Altheimer & Gray, of Chicago, *pro bono*, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Marie Quinlivan, and Kip R. Owen, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SULLIVAN delivered the opinion of the court:

Following a jury trial, defendant was convicted and sentenced to concurrent terms of 75 years on each of two counts of murder, 50 years for armed robbery, and 30 years for attempted armed robbery. He contends on appeal that (1) he was denied his statutory right to a speedy trial; (2) he was not proved guilty beyond a reasonable doubt; (3) the trial court erred in (a) not permitting cross-examination of a key State's witness as to criminal charges pending against her, (b) failing to instruct the jury that the testimony of a narcotics addict is to be scrutinized with caution, and (c) refusing to either admit the evidence deposition of a defense witness or issue a bench warrant to compel her appearance at trial; and (4) he was denied a fair trial by (a) admission of a statement by him not disclosed pursuant to discovery and (b) the prosecutor's inflammatory closing arguments.

The State was required by statute to try defendant on or before September 4, 1981. (Ill. Rev. Stat. 1981, ch. 38, par. 103—5(a).) On September 3, 1981, a hearing was held on the State's motion to extend that term on the ground that a material witness could not be located. (Ill. Rev. Stat. 1981, ch. 38, par. 103—5(c).) Officer Hood testified that Linda Cousins, an eyewitness to the crimes charged, had contacted him several times, the last time being a telephone call on August 24, 1981, in which she was told that a final conference with the State's Attorney would be set for the following day. Cousins left a telephone number where she could be reached, but when he called to notify her of the time and place for the meeting, he was told she was

not staying there. He obtained the name and address listed by the telephone company for that number but was unable to make contact with her despite almost daily calls and visits to that number and address. He went to Cousins' last known residence, where her boyfriend said that he had last seen her approximately two weeks before the hearing and promised to look for her. Subsequent contacts with the boyfriend disclosing that she had been seen in the area within the week before the hearing prompted him (Hood) to look for her in the neighborhood, and he also asked other officers to look for her. Cousins finally called his office the night before the hearing, but he was off duty and did not receive her message until that morning. When he called the telephone number she left, the person answering said that she was not there but that he would tell her to contact the police. Hood admitted that his last contact with Cousins prior to her August 24 call had been in May 1981; that she did not ask Cousins for her address or attempt to arrange a meeting when she called on August 24; that when he went to the apartment building address listed for the telephone number Cousins gave, he did not look for her in other apartments or talk to other residents; that he had not yet ascertained the name and address listed for the telephone number he called that morning; and that he had not contacted the public aid office in his attempt to locate her.

Investigator Ayala testified that he was assigned to serve Cousins with a subpoena on August 25, 1981, and when he went to her last known address, he found that she had moved. He obtained several other possible addresses and telephone numbers, and when a call to one number revealed that she was expected to return there, he delivered a subpoena to that address. He gave other subpoenas and pictures of Cousins to police officers in the area where she normally resided and asked them to look for her. He acknowledged that he had not searched hospitals or tried to locate members of her family; that he did not inquire whether she had been arrested recently; and that he had made no personal attempts to find her since August 28, explaining that he was no longer assigned to the case as of that date and he did not know if other officers were assigned.

The trial court granted a 14-day extension, and trial commenced on September 15, 1981, 11 days after the statutorily prescribed 120-day period had expired.

At trial, Ossie Moore testified that on September 28, 1980, he lived at the Tivoli Hotel and had known another resident, Linda Cousins, for approximately two weeks. On one occasion he had accompanied Cousins to provide protection while she worked as a prostitute,

and on the night in question he visited Cousins at her apartment where she showed him an unloaded .38-caliber gun. When defendant and Denise Bradley, another prostitute, arrived at the apartment a short time later, they had a few drinks and Cousins showed them the gun. Defendant loaded it and suggested they use it to rob the women's "tricks," a plan which he and Cousins rejected. Defendant took the gun with him when they left the apartment during the early morning hours of September 29, and after borrowing a car he (Moore) drove them to 47th and Calumet. After he parked the car in a restaurant lot nearby, Cousins and Bradley got out and walked to the corner. Later, a car stopped next to the women and, after a short conversation with the two male occupants, Cousins got into the car and the passenger alighted. The driver then pulled into the parking lot and drove behind the restaurant, and Bradley and the passenger began walking toward 46th and Calumet. Defendant got out of the car to follow them and, after noticing that the gun was no longer in the car, he (Moore) heard a shot from the direction of 46th and Calumet. Shortly thereafter, Bradley returned alone to the car and defendant then walked behind the restaurant where he (Moore) saw defendant pointing a gun through the window on the passenger's side of the car in which Cousins was seated. Defendant then fired the gun, and the car moved forward crashing into a fence. Cousins got out of that car and ran toward his car, while defendant leaned into the victim's car from the passenger side. Defendant then returned to his car and said he had to shoot both men because they would not cooperate, and also said, "I don't leave no witness when I do something like that, what I did, and therefore any one of you say anything about this here to anyone, I'm going to kill you all, too." He received no money for any of the events which occurred that night and first contacted the police on November 11, 1980, when he learned that a homicide detective was looking for him. He did not go to the police immediately because he was afraid of defendant. During the time he knew Cousins, she injected "T's and Blues" two or three times a day.

Linda Cousins testified that at the time of the murders she and her cousin, Debra Bradley, were prostitutes sharing an apartment with defendant at the Tivoli Hotel. She had known Moore for two to four weeks, and he accompanied her once to protect her while she worked. On the night in question defendant suggested using her gun to rob the women's dates, but she and Moore refused to do so. When they arrived at the restaurant, all four of them got out of the car, and she and Bradley walked to the corner where they stopped a car and arranged a date. She accompanied the driver behind the restaurant,

had sexual relations with him, and received $15. While she was talking to the driver, defendant approached the car from the passenger's side, pointed the gun at the driver, and told him not to move. When the driver turned on the ignition, defendant shot him, and the car rolled forward crashing into a fence. She and defendant returned to Moore's car where she told defendant that he should not have shot the man as he had no more money, and defendant replied that the other man was also dead and that "he wasn't going back to the penitentiary for anybody, and in the event this was told, he was going to kill everybody." She acknowledged that she had carried the gun occasionally when she went out, had used "T's and Blues" since 1978, and before that had used heroin and methadone for approximately two years, but on the day in question she did not use drugs until they returned to her apartment. She did not talk to the police after the shootings until November 9, 1980, because of defendant's threat, although she had contacted them before then when Debra Bradley was murdered.

Police personnel testified that the bullets recovered at the scene and from the victims were fired from the same gun, which was either a .38 special or a .357 magnum; that Cousins contacted them about Debra Bradley's murder on October 20, 1980, but did not mention the two September 29 murders; that they contacted Cousins and Moore in early November for questioning about those murders; and that in her statements at that time Cousins stated that prior to the murders defendant and Moore had discussed robbing "tricks."

Valerie Davis, a defense witness, testified that she heard a car crash in the vacant lot adjacent to her apartment between 5 and 5:30 a.m. on September 29, 1980, and when she looked out the window she observed a car, which she later identified as the victim's, with a man standing on the driver's side and a woman standing on the passenger's side. Those two people stood beside the car talking for 10 to 15 minutes and then walked toward Calumet Street. She identified those individuals in lineups two days after the murder, and she knew the woman as a prostitute in the neighborhood. She admitted that she did not hear a gunshot; that she saw their faces only for a short time; and that she identified the woman in the lineup because her hair was similar to that of the woman she knew, but she was not sure that she was the same woman seen standing beside the car.

Henrietta Winfield, defendant's mother, testified that she got up at approximately 3:45 a.m. on the morning in question and went to defendant's bedroom where she saw him asleep. He awoke a short time later and joined her in the kitchen, and when she left for work

at 5:30 a.m. he was standing at a window in their home. She did not tell the police that defendant was at home at the time of the murders.

Police personnel testified in rebuttal that when interviewed two days after the murders, Valerie Davis said she saw a female impersonator get out of the car and run away, and that when interviewed a few weeks before trial, Davis did not mention seeing a man next to the car and said she was not sure who the woman was but thought that she was a person she (Davis) knew by the name of Joyce.

OPINION

We first address defendant's contention that he was denied his statutory right to a speedy trial. He maintains that the State failed to use due diligence in its attempts to locate a material witness, and the trial court's grant of a continuance was therefore unwarranted.

In order to implement the constitutional requirement of a speedy trial, the legislature has provided that "[e]very person in custody *** for an alleged offense shall be tried *** within 120 days ***." (Ill. Rev. Stat. 1981, ch. 38, par. 103—5(a); *People v. Garcia* (1978), 65 Ill. App. 3d 472, 382 N.E.2d 371.) However, that statute further provides for an extension of the 120-day period for up to an additional 60 days "[i]f the court determines that the State has exercised without success due diligence to obtain evidence material to the case and that there are reasonable grounds to believe that such evidence may be obtained at a later date ***." (Ill. Rev. Stat. 1981, ch. 38, par. 103—5(c).) Thus, the decision whether to grant a continuance has been placed within the discretion of the trial court, and its determination will not be disturbed absent a clear abuse of that discretion. *People v. Richards* (1980), 81 Ill. 2d 454, 410 N.E.2d 833.

In the instant case, once it became apparent 10 days before expiration of the 120-day period that a material witness could not be located, officers visited her last known address, contacted several of her acquaintances, left messages for her at various locations where she was expected to return, and searched the area where she usually resided and was recently seen. The fact that she responded to these efforts the day before the hearing indicated reasonable grounds to believe that she would be located soon. Similar efforts were found to constitute due diligence in *People v. DeVore* (1978), 62 Ill. App. 3d 412, 378 N.E.2d 1302, where the State first attempted to locate two material witnesses 12 days before the 120-day term was to expire. Investigators went to their last known residences and, after ascertaining that the two men were still in the area, left messages with family members that the witnesses were to contact the State's Attorney. We

held that, under those circumstances, the trial court did not abuse its discretion in granting the State a two-week continuance, noting that "the State had no reason to believe the witnesses would be unavailable when the initial efforts were commenced to secure their attendance at trial." 62 Ill. App. 3d 412, 417, 378 N.E.2d 1302, 1306.

■ Defendant argues that this case is distinguishable, asserting that, given Cousins' occupation and criminal background, the State should have known that she would be difficult to locate. Therefore, he posits, the State's attempts to locate her should have begun much earlier and been more intensive. He relies on *People v. Shannon* (1975), 34 Ill. App. 3d 185, 340 N.E.2d 129, where efforts to ascertain the availability of two witnesses first began four days before expiration of the 120-day term. The unavailable witnesses were two police officers who were on vacation and could not be located. In holding that the State had not demonstrated due diligence in locating its witnesses, we noted that police vacation schedules were made up 14 months in advance. Thus, in *Shannon*, the State should have learned long in advance that a material witness would not be available at the end of the 120-day period. (*People v. DeVore* (1978), 62 Ill. App. 3d 412, 378 N.E.2d 1302; *People v. Robinson* (1976), 44 Ill. App. 3d 447, 358 N.E.2d 43.) For this reason, we believe that *Shannon* is inapposite. Here, the testimony establishes that the witness voluntarily contacted an officer assigned to the case on several occasions, with the last contact—again initiated by her—being on August 24, at which time she left a telephone number where she purportedly could be contacted. Given the cooperation shown by her up until that time, we do not believe that the State had reason to know before August 24 that she would be difficult to locate. In *People v. Hardy* (1979), 70 Ill. App. 3d 351, 387 N.E.2d 1042, a witness assured the State that he would be available, and no efforts were made to locate him until he failed to keep an appointment with the State's Attorney. We found that "[t]he State's efforts to locate the witness were not unreasonable in view of the fact that in assuring [the State's Attorney] that he would be available as a witness, [he] did not give the State reason to believe that he would be difficult to locate." (70 Ill. App. 3d 351, 362, 387 N.E.2d 1042, 1051.) Similarly, here, Cousins' repeated, voluntary contacts with the investigating officer over a period of several months did not give the State reason to believe that she would be difficult to locate; therefore, we believe that the State's efforts were sufficient to demonstrate due diligence, and the trial court did not abuse its discretion in granting a 14-day extension.

Defendant next contends that he was not proved guilty beyond a

reasonable doubt. He maintains that the two State's witnesses who provided the only evidence of his involvement in the crimes were not credible, given the inconsistencies in their testimony and their involvement in the events leading up to the crimes.

We consider first defendant's argument that the self-contradiction in the testimony of the witnesses, as well as the conflict between their versions of the events, raises a reasonable doubt as to his guilt. The State has the burden of proving beyond a reasonable doubt that the accused is the person who committed the crime charged (*People v. Bridges* (1979), 71 Ill. App. 3d 868, 390 N.E.2d 407), and it is the function of the jury to determine whether that burden has been met (*People v. McDonald* (1976), 62 Ill. 2d 448, 343 N.E.2d 489); therefore, a reviewing court may not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of the witnesses (*People v. Dunklin* (1982), 104 Ill. App. 3d 685, 432 N.E.2d 1323) but will reverse only if the evidence is so improbable, impossible, or unsatisfactory as to raise a reasonable doubt of defendant's guilt (*People v. Carlson* (1980), 79 Ill. 2d 564, 404 N.E.2d 233; *People v. Hancock* (1980), 83 Ill. App. 3d 700, 404 N.E.2d 914). Moreover, we have repeatedly held that discrepancies or conflicts in testimony affect only the credibility of a witness and the weight to be given his testimony (*People v. Childs* (1981), 95 Ill. App. 3d 606, 420 N.E.2d 513), whether that conflict is between the testimony of two prosecution witnesses (*People v. Yarbrough* (1977), 67 Ill. 2d 222, 367 N.E.2d 666) or within the testimony of a single prosecution witness (*People v. Payne* (1981), 102 Ill. App. 3d 950, 429 N.E.2d 1344), and the effect of such discrepancies is therefore a matter for the trier of fact to weigh in reaching its determination (*People v. Hobson* (1979), 77 Ill. App. 3d 22, 396 N.E.2d 53), particularly where the inconsistencies are immaterial, since slight discrepancies do not render evidence insufficient to sustain a conviction (*People v. Kester* (1979), 78 Ill. App. 3d 902, 397 N.E.2d 888).

Admittedly, there are some self-contradictions in the testimony of the two witnesses. In prior testimony, Moore stated that Cousins worked for him as a prostitute, but he testified to the contrary at trial. He also stated at trial that he started to enter the restaurant while waiting for the others to return, but later said that he never left the car. Also, in a statement to the police he said that he drove to the victim's car to pick Cousins up after the shooting, but at trial he testified that Cousins ran back to his car. Cousins' testimony reveals similar discrepancies. She was confused as to the order in which Moore, defendant, and Bradley arrived at her apartment on the night

in question; whether she or Bradley left the corner first; and whether only defendant, or defendant and Moore, discussed robbing her customers. Finally, there are several points of conflict between the testimony of the two witnesses. They disagreed on whether Cousins ever carried a gun when she worked as a prostitute; whether she told Moore where she got the gun and how long she had had it; whether the gun was loaded when she first showed it to Moore; and whether all four of them or only Cousins and Bradley got out of the car when they first arrived at 47th and Calumet.

Defendant claims that these numerous contradictions "on fundamental details" totally undermine their testimony and show that they created a story to protect themselves. Initially, we note that not all of the instances alleged by defendant are discrepancies; they might better be explained as differences in the knowledge of the two witnesses or in the way they interpreted the questions asked of them. Moreover, we do not believe that the details in question are fundamental; rather, they go to collateral, insubstantial matters. What is significant is that the witnesses made positive, consistent statements that they saw defendant commit the crimes alleged. Furthermore, we believe that "the likelihood of their collaboration on a made-up version of the events would probably be stronger had their testimonies been identical in every detail" (*People v. Rodriquez* (1981), 100 Ill. App. 3d 244, 249, 426 N.E.2d 586, 589), for it is rare that two individuals will re-create a long sequence of events with total agreement and accuracy or recall each detail in precisely the same manner. Since we do not believe that these discrepancies render the testimony improbable, reversal is not required, and their existence was solely a matter for the jury to consider in determining the credibility of these witnesses and the weight to be given to their testimony.

Defendant further argues, however, that we must view the testimony of Moore and Cousins with "the utmost skepticism" because of their involvement in the crimes charged. It is his position that, when viewed in that light, the inconsistencies in their testimony are sufficient to raise a reasonable doubt as to his guilt.

Although defendant has avoided using the term "accomplice" in describing Moore and Cousins, the cases he cites in arguing that their testimony must be viewed with caution involve witnesses who were also indicted for the crimes charged therein and either received immunity or were allowed to plead guilty to a lesser charge in exchange for their testimony. (*People v. Wilson* (1977), 66 Ill. 2d 346, 362 N.E.2d 291; *People v. Price* (1974), 21 Ill. App. 3d 665, 316 N.E.2d 289.) In the instant case, it does not appear that Moore and Cousins were ac-

complices, for the test is whether they could have been indicted for these offenses. (*People v. Robinson* (1974), 59 Ill. 2d 184, 319 N.E.2d 772.) Thus, the evidence must show that they took some part in the crime charged (*People v. Turner* (1980), 92 Ill. App. 3d 265, 415 N.E.2d 1114) or, as stated in *People v. Travis* (1981), 94 Ill. App. 3d 983, 991, 419 N.E.2d 433, 440, that they "knowingly, voluntarily, and with common interest unite[d] with the principal offender in the commission of the crime." Nothing in this record indicates that Moore and Cousins were ever arrested for or charged with the crimes in question, nor is there any evidence that they took part in them. Their mere presence at the scene is insufficient to make them accomplices to murder and armed robbery. While they were engaged in criminal activities—*i.e.*, prostitution—at the time that the crimes charged herein were committed, such involvement does not establish that they knowingly or voluntarily participated with defendant in committing these other crimes. A similar situation arose in *People v. Travis* (1981), 94 Ill. App. 3d 983, 419 N.E.2d 433, where we determined that the court properly refused to instruct the jury on the credibility of an accomplice. We found that a prosecution witness who had participated with the defendant in the crime of forgery was not an accomplice to murder where the testimony revealed that the defendant had procured the instruments forged after murdering his employer, but there was no evidence that the witness had participated in the murder.

Furthermore, even assuming *arguendo* that Moore and Cousins were accomplices in the crimes charged, that fact alone would not require reversal, since the uncorroborated testimony of an accomplice is sufficient to sustain a conviction (*People v. Wilson* (1977), 66 Ill. 2d 346, 362 N.E.2d 291), and while we may view such testimony with suspicion (*People v. Baynes* (1981), 88 Ill. 2d 225, 430 N.E.2d 1070) and scrutinize it carefully on review (*People v. Bennett* (1980), 90 Ill. App. 3d 64, 412 N.E.2d 1001), the fact that a witness is an accomplice or expects leniency does not destroy his credibility (*People v. Harvey* (1981), 95 Ill. App. 3d 992, 420 N.E.2d 645); rather, it affects the weight to be given his testimony (*People v. Bennett* (1980), 90 Ill. App. 3d 64, 412 N.E.2d 1001) and is therefore a matter for the trier of fact (*People v. Kennedy* (1980), 88 Ill. App. 3d 365, 410 N.E.2d 520).

Defendant argues, however, that it is the numerous inconsistencies in the testimony, when viewed in the light of their complicity, which mandates a finding that he was not proved guilty beyond a reasonable doubt. He relies initially on *People v. Wilson* (1977), 66 Ill. 2d

346, 362 N.E.2d 291, where an accomplice was promised immunity in exchange for his testimony implicating the defendant in the crime. His testimony alone linked the defendant to the crime, while other prosecution witnesses testified that the victim could not identify the defendant and in fact had identified someone else as her assailant, and that the defendant was six feet one inch tall, while the victim described her attacker as five feet six inches tall. Based on these discrepancies, the court reversed defendant's conviction. Defendant also relies on *People v. Price* (1974), 21 Ill. App. 3d 665, 316 N.E.2d 289, where we reversed upon a finding that the testimony of accomplices, who were allowed to plead guilty to lesser charges in exchange for their testimony, was totally improbable. In particular, we noted that the defendant, who allegedly planned and executed the robbery, received no part of the proceeds, and that the accomplices had extensive criminal backgrounds, in stark contrast with the defendant's total lack of prior criminal involvement.

We believe that these cases are distinguishable. In each, the discrepancies noted went to material matters involving the identity of the accused; whereas, here, we have determined that the discrepancies went to minor, collateral matters. Similar inconsistencies were found insufficient to raise a reasonable doubt in *People v. Jeffrey* (1981), 94 Ill. App. 3d 455, 418 N.E.2d 880. There, the testimony of three accomplice witnesses contained not only self-contradictions but conflicts among the witnesses; for example, on whether—before the crime—one witness had ever been to the home burglarized, whether the defendants had threatened their accomplices, which defendant had tied up the victim and which had disposed of items taken, and whether the perpetrators wore gloves. In addition, in *Jeffrey*, as here, a family member provided an alibi for one of the defendants. This court found that the impeachment or contradiction on "peripheral matters" was insufficient to render the accomplice testimony "so improbable or unworthy of belief as to vitiate the verdict." 94 Ill. App. 3d 455, 460, 418 N.E.2d 880, 885.

Also in point is *People v. Sherman* (1980), 87 Ill. App. 3d 937, 409 N.E.2d 486, where the defendant presented alibi witnesses and the accomplice-witness was impeached on several collateral matters. We found that these contradictions were not "so unreasonable, improbable, or unsatisfactory" as to raise a reasonable doubt as to defendant's guilt, and "[w]e decline[d] to substitute our judgment for that of the jury which heard the evidence and had the opportunity to observe the demeanor of the witnesses." (87 Ill. App. 3d 937, 940, 409 N.E.2d 486, 489.) Similarly, here, we have determined that the

testimonial discrepancies were not so improbable as to raise a reasonable doubt. Those inconsistencies were presented at trial and vigorously argued to the jury, which had an opportunity to determine which witnesses were credible, and we decline to substitute our judgment for that of the jurors.

Defendant next contends that the trial court erred in not permitting cross-examination of a prosecution witness concerning criminal charges pending against her. He correctly asserts that, as a part of his constitutional right to confront witnesses against him (U.S. Const., amend. VI; Ill. Const. 1970, art. I, sec. 8), he has a right to cross-examine the State's witnesses (*Davis v. Alaska* (1974), 415 U.S. 308, 39 L. Ed. 2d 347, 94 S. Ct. 1105), which includes inquiry into the fact that a witness has been arrested or charged with a crime (*People v. Barr* (1972), 51 Ill. 2d 50, 51, 280 N.E.2d 708, 710) where such inquiry would "develop matters that would reasonably show the bias, motive or willingness of the State's witnesses to to testify" (*People v. Wilkerson* (1981), 87 Ill. 2d 151, 156, 429 N.E.2d 526, 528). The State maintains, however, that no constitutional right of defendant was denied; rather, it argues, the court properly sustained its objection to cross-examination concerning pending cases because defendant had not shown that there were in fact cases pending.

At trial, defense counsel attempted to question Cousins about three bond forfeiture warrants allegedly issued against her. After an objection, there was a discussion in chambers at which defense counsel stated "to the best of my knowledge these other three cases are pending" and, in support thereof, he tendered a Bureau of Identification sheet from the Chicago Police Department. The trial court, indicating its belief that such sheets are generally inaccurate, refused to permit the questioning without a showing that the cases were pending. The court stated that the witness could be recalled for further cross-examination if it was shown that there were pending cases involving her, and the court suggested to counsel that the court files could be subpoenaed to determine whether cases were pending. It appears, then, that the question is not whether defendant has a right to cross-examine State's witnesses about pending criminal charges, but whether, under these facts, the court properly excluded such inquiry in the absence of a showing that the cases were in fact pending.

Defendant argues that, under *People v. Kellas* (1979), 72 Ill. App. 3d 445, 389 N.E.2d 1382, he was not obligated to prove that criminal charges were pending before asking the witness whether there were any. However, we believe his reliance on *Kellas* is misplaced since it does not hold, as defendant suggests, that the pendency of a criminal

charge need not be shown; rather, we stated there that "the admissibility of this type of impeachment is not dependent on whether the examining counsel can prove before hand that any promises of leniency or special favors had in fact been made to the witness." (72 Ill. App. 3d 445, 453, 389 N.E.2d 1382, 1390.) Thus, it appears that, in *Kellas*, a criminal charge was in fact pending, or its existence was at least not questioned, but the trial court would not allow cross-examination thereon unless it was also shown that promises of leniency had been made with regard to that pending charge. We noted there that because defense counsel may not know in advance whether promises had been made, no offer of proof as to that fact was necessary. Furthermore, we noted the evidence was clearly admissible "to afford a basis for an *inference* of undue pressure" (72 Ill. App. 3d 445, 454, 389 N.E.2d 1382, 1390), whether or not specific promises had been made by the State regarding those cases. Thus, the proof demanded by the trial court in *Kellas* was irrelevant to the admissibility of the proffered evidence.

Moreover, while defendant is entitled to wide latitude in his attempts to show bias on the part of the State's witnesses (*People v. Wilkerson* (1981), 87 Ill. 2d 151, 429 N.E.2d 526), the scope of cross-examination is generally within the discretion of the trial court (*People v. Barr* (1972), 51 Ill. 2d 50, 280 N.E.2d 708), subject to reversal only where there is an abuse of that discretion which results in manifest prejudice to the defendant (*People v. Richard* (1980), 90 Ill. App. 3d 322, 413 N.E.2d 5), and we have repeatedly held that there is no such abuse unless an offer of proof demonstrates that the evidence excluded is positive and direct on the issue of bias or motive to testify falsely (*People v. Richard* (1980), 90 Ill. App. 3d 322, 413 N.E.2d 5; *People v. Nowak* (1979), 76 Ill. App. 3d 472, 395 N.E.2d 28; *People v. Pickett* (1975), 34 Ill. App. 3d 590, 340 N.E.2d 259), rather than remote or uncertain (*People v. Bristow* (1980), 80 Ill. App. 3d 535, 400 N.E.2d 511). These cases are inconsistent with defendant's assertion that no offer of proof is necessary, for they clearly hold that the trial court may preclude cross-examination to show bias or motive to testify where no proof as to competency or relevancy is offered or the offer is unsatisfactory, subject to reversal only if its decision constitutes an abuse of discretion.

Defendant further argues, however, that the Bureau of Identification sheets, not included in the record herein, were sufficient proof that these cases were still pending. In support thereof, he relies on *People v. Galloway* (1974), 59 Ill. 2d 158, 319 N.E.2d 498, and *People v. Norwood* (1973), 54 Ill. 2d 253, 296 N.E.2d 852, which hold that the

police records of witnesses are discoverable for purposes of determining whether any cases are pending against them. We believe that these cases are inapposite, for they do not consider whether the records alone are sufficient proof for impeachment purposes. More in point is *People v. Hardy* (1979), 70 Ill. App. 3d 351, 387 N.E.2d 1042, where defense counsel was prevented at trial from cross-examining a witness about prior arrests and bond forfeitures contained in his police record. We held that the trial court had not abused its discretion in excluding this evidence, noting that "only pending charges would be relevant to demonstrate that the witness might receive a benefit in exchange for his testimony." (70 Ill. App. 3d 351, 360, 387 N.E.2d 1042, 1050.) It appears, then, that in *Hardy* we were not satisfied that a bond forfeiture warrant appearing in a police record was sufficient proof that the case was still pending.

 ■ In the instant case, the trial court told defense counsel that he could inquire about pending cases, as the court did in *Hardy*, but only after a showing that there were in fact cases pending against the witness, and it explained why it believed the proof provided was inadequate. Defendant has not refuted the trial court's statement that the information relied upon by defense counsel was frequently inaccurate. Moreover, although the trial court explicitly stated what proof would be acceptable and informed counsel that the witness would be recalled when the proof was obtained, it appears that counsel made no attempt to show that there were pending cases. For these reasons, we reject the contention that the trial court abused its discretion in sustaining the State's objection to the use of this evidence.

Defendant alleges further error in the trial court's refusal to admit the evidence deposition of a defense witness; or, in the alternative, to issue a bench warrant to compel her attendance at trial. He maintains that the witness was unavailable and her testimony was relevant to contradict Moore's statement that defendant walked back to the car after shooting the passenger. It appears that the witness would have testified that she lived in the apartment building where the passenger was killed and that, while not seeing anything, she heard a gunshot followed by footsteps running from the building and a car pulling away.

Supreme Court Rule 414(a) (73 Ill. 2d R. 414(a)) provides:

> "If it appears to the court in which a criminal charge is pending that the deposition of any person other than the defendant is necessary for the preservation of relevant testimony because of the substantial possibility it would be unavailable at the time of hearing or trial, the court may, upon motion and notice to

both parties and their counsel, order the taking of such person's deposition under oral examination or written questions for use as evidence at a hearing or trial."

This rule makes possible the use of a witness' deposition at trial (*People v. Young* (1976), 39 Ill. App. 3d 480, 350 N.E.2d 488), but only upon a showing that the witness is unavailable to testify in person (*People v. Malone* (1976), 41 Ill. App. 3d 914, 354 N.E.2d 911).

■ Here, during the trial, defendant informed the court that his next and last witness, Sarah Hill, was unable to come to court because of her physical condition and asked that he be allowed to take her evidence deposition that afternoon. The trial judge, after noting the tardiness of the request, ordered that the deposition be taken but reserved ruling on its admissibility. He also indicated to defense counsel that he would not allow the deposition to be read unless a medical examination supported her alleged inability to be present. The following morning, he ruled the deposition inadmissible on the basis that there was an insufficient showing that she could not come to court. Absent the requested medical support, we find that there was no abuse of discretion since the witness, in her deposition, indicates that while she apparently had some unnamed condition which hampered her mobility, she was able to walk with crutches and ride in a car. Furthermore, when asked whether she could attend court in a wheelchair, she avoided the question by responding that she did not have one. Finally, other statements indicate a reluctance on her part to testify rather than an inability to appear. She suggested that others living in the building were able to provide the same information, and when asked if she was physically able to appear in person, she responded:

"No, I ain't testifying in no case. What am I going to testify for. I can't tell you no more than what I already told you."

■ In any event, defendant urges that once it determined that the deposition was inadmissible, the trial court should have granted his request that a bench warrant be issued to compel her attendance. However, while a defendant's right to compel the attendance of witnesses on his behalf is a fundamental constitutional right (U.S. Const., amend. VI; Ill. Const. 1970. art. I, sec. 8; *People v. Watson* (1966), 36 Ill. 2d 228, 221 N.E.2d 645), it appears settled that while a bench warrant is occasionally the only means to insure the appearance of a reluctant witness (*People v. Rogers* (1975), 27 Ill. App. 3d 123, 327 N.E.2d 163), defendant's constitutional rights are not infringed by the court's refusal to issue a bench warrant in the absence of proper service of a subpoena (*People v. Hicks* (1971), 133 Ill. App. 2d 424, 273

N.E.2d 450). In the instant case, the record indicates that the witness was not subpoenaed and that no request was made for a continuance to effect service of subpoena when his motion to admit the evidence deposition was denied. Therefore, issuance of a bench warrant was inappropriate, and the court correctly refused defendant's request.

Defendant also contends that the trial court erred in refusing to instruct the jury on the credibility of a narcotics addict. The testimony of Moore indicated that at the time of the offenses charged, Cousins used a drug known as "T's and Blues," perhaps as often as two or three times a day during the two weeks he had known her, and Cousins admitted she had used narcotics "off and on" for approximately two years but on the day in question had not used drugs until after the shootings. Defendant tendered the following non-IPI instruction:

> "The fact that a witness was a narcotics addict or used narcotics at about the time of the alleged crime may be considered by you in passing upon the credibility of that witness. The testimony of such a witness is to be scrutinized with great caution."

The trial court sustained the State's objection to this instruction, noting that there was insufficient evidence from which to conclude that Cousins was an addict and that the instruction improperly singled out Cousins' testimony.

When a party tenders a non-IPI instruction, the trial court has discretion to determine whether the instruction should be given (*People v. Moore* (1980), 89 Ill. App. 3d 202, 411 N.E.2d 579), and while a court is not precluded from giving a non-IPI instruction concerning the credibility of a witness who was a drug addict at the time the offense charged was committed (*People v. Franz* (1977), 54 Ill. App. 3d 550, 368 N.E.2d 1091), such an instruction must be "appropriate for the circumstances of the case and free from argument as to the correct principles of law applicable to the facts" (*People v. Smith* (1979), 70 Ill. App. 3d 250, 256, 387 N.E.2d 901, 905). Furthermore, such an instruction is not mandated (*People v. Thorns* (1978), 62 Ill. App. 3d 1028, 379 N.E.2d 641), and we have found that the refusal to give a non-IPI instruction concerning a narcotics addict's testimony was not an abuse of discretion (*People v. Blackwell* (1979), 76 Ill. App. 3d 371, 394 N.E.2d 1329).

Initially, we note that one of the first cases to consider a special instruction on the credibility of a narcotics addict, *People v. Phillips* (1970), 126 Ill. App. 2d 179, 186, 261 N.E.2d 469, 472, stated that, under appropriate circumstances, it was "clearly in order." There, however, it was held that the instruction was properly refused be-

cause it contained an incorrect statement of the law. Several subsequent cases have relied on *Phillips* in stating that it is appropriate to give the jury a properly-worded instruction (*People v. Franz* (1977), 54 Ill. App. 3d 550, 368 N.E.2d 1091; *People v. Franklin* (1974), 22 Ill. App. 3d 775, 317 N.E.2d 611); however, others have questioned the proposition, finding as did the trial court here, that such an instruction "unreasonably single[s] out the testimony of the addict" (*People v. Collins* (1977), 48 Ill. App. 3d 643, 650, 362 N.E.2d 1118, 1124; accord, *People v. McVay* (1981), 98 Ill. App. 3d 708, 424 N.E.2d 922). Moreover, other cases have criticized the underlying assumption of the instruction which *Phillips* characterizes as proper—that narcotics addicts are conclusively presumed noncredible. See *People v. Smith* (1979), 70 Ill. App. 3d 250, 387 N.E.2d 901.

■ We need not resolve the apparent conflict regarding the propriety of this type of instruction, for it is settled that an instruction on the credibility of a narcotics addict is improper where it contains an erroneous statement of the law (*People v. Phillips* (1970), 126 Ill. App. 2d 179, 261 N.E.2d 469) or if there is insufficient evidence to indicate a witness' addiction to narcotics (*People v. McVay* (1981), 98 Ill. App. 3d 708, 424 N.E.2d 922). In the instant case, the trial court specifically noted that there was not sufficient proof of Cousins' addiction. In *McVay*, we found that the trial court properly refused to give a tendered instruction on the credibility of a narcotics addict where the testimony at trial indicated that a prosecution witness was a drug user, but the trial court found this insufficient evidence of addiction. Furthermore, the tendered instruction here refers to a witness who was "a narcotics addict *or used narcotics*" at about the time the crimes occurred. Defendant has not cited, nor has our own research discovered, any case which holds that, even if a witness is not an addict, the jury must scrutinize such testimony with great caution if it finds that the witness had "used narcotics." Therefore, we do not believe that the tendered instruction correctly sets forth the law, and the trial court did not abuse its discretion in refusing it.

Even assuming *arguendo* that the instruction tendered was appropriate and that the evidence was sufficient to establish that Cousins was a narcotics addict, reversal is not required unless defendant was so prejudiced by the court's failure to give this instruction as to affect the outcome of the verdict. (*People v. Bertucci* (1980), 81 Ill. App. 3d 851, 401 N.E.2d 1123.) Here, defense counsel repeatedly brought Cousins' drug use to the jury's attention during cross-examination of Cousins and Moore and attacked her credibility during closing argument by telling the jury that she "is a drug addict and has been one

for a long time" and that "the testimony of a drug addict is probably the most suspect that could ever be given in a criminal courtroom." Cousins' credibility was further attacked by frequent references to her occupation, a prior felony conviction for theft by deception, her delay in notifying the police of the crime and her involvement therein, her possible fear of being charged or hopes for favorable treatment, and the discrepancies in her testimony. Thus, the jury was aware of Cousins' drug use and was able to consider its effect on her credibility, as the general instruction on the credibility of witnesses which was given (Illinois Pattern Jury Instruction (IPI), Criminal, No. 1.02 (2d ed. 1981)) instructs them to do. Finally, the testimony of Moore alone would have been sufficient to convict defendant (*People v. Yarbrough* (1977), 67 Ill. 2d 222, 367 N.E.2d 666); therefore, we do not believe that the court's failure to instruct the jury on the credibility of a narcotics addict so prejudiced defendant as to affect the outcome of the verdict (compare *People v. Bertucci* (1980), 81 Ill. App. 3d 851, 401 N.E.2d 1123).

Defendant next contends that the trial court should have excluded evidence that he threatened two prosecution witnesses. He maintains that his oral statements to Moore and Cousins were not disclosed pursuant to his discovery motion requesting "[a]ny written or recorded statement or statements and the substance of any oral statements made by the accused." He further asserts that his statement to Cousins constituted inadmissible evidence of his prior convictions.

Supreme Court Rule 412 provides in part that the State shall disclose "the substance of any oral statement of the accused" which is "within its possession or control" (73 Ill. 2d R. 412(a)), so that defense counsel may have an opportunity to investigate the circumstances surrounding the statement in order to protect the defendant from surprise and inadequate preparation (*People v. Perez* (1981), 101 Ill. App. 3d 64, 427 N.E.2d 820). Compliance therewith is mandatory (*People v. Miles* (1980), 82 Ill. App. 3d 922, 403 N.E.2d 587), and the State must disclose not only statements made to law enforcement personnel in the nature of an admission or confession, but *all* statements known to it (*People v. Romo* (1980), 85 Ill. App. 3d 886, 407 N.E.2d 661), including those made to witnesses unconnected with the State (*People v. Greer* (1980), 79 Ill. 2d 103, 402 N.E.2d 203) as soon as the substance thereof is known (*People v. Weaver* (1980), 90 Ill. App. 3d 299, 412 N.E.2d 1353). Furthermore, the State has a duty to use due diligence to ensure that it becomes aware of statements (*People v. Williams* (1981), 96 Ill. App. 3d 250, 421 N.E.2d 248); thus, while the State cannot be accused of withholding evidence not in its possession,

it must "see that there is a proper flow of information between all the branches and personnel of its law enforcement agencies and its legal officers" (*People v. Shegog* (1976), 37 Ill. App. 3d 615, 617, 346 N.E.2d 208, 211). Finally, once the trial court determines that a discovery violation has occurred, it may impose any sanction which, in its discretion, it "deems just under the circumstances" (73 Ill. 2d R. 415(g)); thus, it may order compliance, grant a continuance, exclude the evidence in question, or declare a mistrial if appropriate (*People v. Watson* (1979), 76 Ill. App. 3d 931, 395 N.E.2d 682). However, the preferred sanction is a recess or continuance if the granting thereof would be effective to protect the defendant from surprise and prejudice (*People v. Nelson* (1980), 92 Ill. App. 3d 35, 415 N.E.2d 688, *cert. denied* (1981), 454 U.S. 900, 70 L. Ed. 2d 217, 102 S. Ct. 404, and we will not reverse the trial court's exercise of discretion in the absence of a showing of surprise or prejudice to the defendant (*People v. Coleman* (1980), 91 Ill. App. 3d 646, 415 N.E.2d 553) and generally will deem any objection to the undisclosed statement waived for purposes of review where defendant fails to seek a continuance in order to investigate it (*People v. Ferguson* (1981), 102 Ill. App. 3d 702, 429 N.E.2d 1321).

In the instant case, after Moore testified that defendant and Cousins returned to his car following the shootings, he was asked whether defendant said anything at that time. Defense counsel did not object to this question, and Moore responded that defendant had threatened them. Again, defense counsel did not object nor did he request a recess or a continuance to investigate the circumstances surrounding the making of this statement; instead, he questioned Moore further on cross-examination about the alleged threat and failed to object when Moore repeated his testimony on redirect. Subsequently, when Cousins was asked on direct examination what defendant said in threatening her, defense counsel once again did not object, but when Cousins responded by repeating the words of threat but adding the statement that "[h]e said he wasn't going back to the penitentiary for anybody," defense counsel moved for a mistrial, arguing that these statements had not been disclosed pursuant to his discovery request and that the portion thereof referring to the penitentiary was inadmissible evidence of a prior conviction. The State acknowledged that the substance of the statements, the threat, was known to it before trial but claimed that Cousins never revealed defendant's reference to the penitentiary. The trial court found that the penitentiary statement was improper but refused to grant a mistrial.

Defendant argues that the entire threat testimony of both

witnesses took him by surprise and therefore should have been excluded. However, even assuming that the testimony was improper, the trial court was never asked to exclude it or to strike it and have the jury instructed to disregard it; therefore, there can be no error in failing to do so. (*People v. Burage* (1961), 23 Ill. 2d 280, 178 N.E.2d 389, *cert. denied* (1962), 369 U.S. 808, 7 L. Ed. 2d 555, 82 S. Ct. 651.) Furthermore, defendant's claim of surprise is negated by his failure to object to the testimony when it was first introduced in the direct examination of Moore or seek a recess or a continuance to investigate the circumstances of the statement, although he was then aware that Cousins was also present when the statement was made. Therefore, we believe that—at least as regards the general substance of the threat—defendant has waived any objection thereto.

■ Defendant's further statement about not returning to the penitentiary, however, was first introduced in Cousins' testimony, and defense counsel promptly requested a mistrial; thus, objection thereto has not been waived since a portion of a statement may be inadmissible to the extent that it was not disclosed pursuant to discovery. (See *People v. Lewis* (1981), 95 Ill. App. 3d 82, 419 N.E.2d 641.) With regard to this portion of defendant's statement, the trial court found that it was unknown to the State prior to Cousins' testimony; therefore, it was not discoverable under Rule 412. Defendant argues that the State's lack of knowledge is immaterial, asserting that it failed to exercise due diligence in learning of this further statement. However, we have found a lack of due diligence in the State's failure to discover the existence of a statement only where it was made to law enforcement personnel or legal officers (*People v. Miles* (1980), 82 Ill. App. 3d 922, 403 N.E.2d 587), for only then can it be said that the evidence is within the possession and control of the State or its agents (*People v. Shegog* (1976), 37 Ill. App. 3d 615, 346 N.E.2d 208) as required by Rule 412. Where the statement is known only to a witness who is not an officer or agent of the State, it is not within the State's possession or control (*People v. Watkins* (1975), 34 Ill. App. 3d 369, 340 N.E.2d 92), and we have held that it is therefore not evidence which the State could have discovered by the exercise of due diligence (*People v. Kradenych* (1980), 83 Ill. App. 3d 547, 404 N.E.2d 488; see also *People v. Sakalas* (1980), 85 Ill. App. 3d 59, 405 N.E.2d 1121 (the due diligence requirement of discovery pursuant to Rule 412(g))). For these reasons, we believe that the statement made to Cousins, who was not an officer or agent of the State, was not within the State's possession or control, and its lack of knowledge thereof and failure to disclose it did not violate Rule 412.

Defendant further argues, however, that even if the State did not violate discovery rules, the statement that "[defendant] wasn't going back to the penitentiary for anybody" was inadmissible evidence of prior crimes, and the trial court therefore should have allowed his motion for a mistrial.

Generally, "evidence of offenses other than those for which a defendant is being tried is inadmissible" (*People v. Romero* (1977), 66 Ill. 2d 325, 330, 362 N.E.2d 288, 290), and this evidentiary rule is violated by a reference to the fact that defendant was on probation when he committed the crime charged (*People v. Smith* (1976), 41 Ill. App. 3d 884, 354 N.E.2d 531) or by testimony concerning a defendant's statement that he does not wish to return to prison (*People v. Goodwin* (1979), 69 Ill. App. 3d 347, 387 N.E.2d 433); however, any prejudice in the presentation of such testimony is generally cured by sustaining an objection thereto and instructing the jury to disregard it (*People v. Burnett* (1979), 74 Ill. App. 3d 990, 394 N.E.2d 456), and the decision whether or not to grant a mistrial is within the broad discretion of the trial court (*People v. Watson* (1982), 103 Ill. App. 3d 992, 431 N.E.2d 1350), a decision which will not be disturbed unless the defendant establishes that he was prejudiced both by the comment complained of and by the denial of his motion for a mistrial (*People v. Omatto* (1980), 88 Ill. App. 3d 438, 410 N.E.2d 588). Thus, it must appear that there was a manifest necessity for the mistrial or that the ends of justice would be defeated by continuance of the trial (*People v. Roberts* (1980), 83 Ill. App. 3d 311, 404 N.E.2d 278); that is, that the jury has been so influenced and prejudiced that it would not, or could not, be fair and impartial (*People v. Rose* (1979), 77 Ill. App. 3d 330, 395 N.E.2d 1081), and the damaging effect of the evidence cannot be remedied by admonitions or instructions (*People v. Henderson* (1976), 36 Ill. App. 3d 355, 344 N.E.2d 239).

■ Here, the trial court found the statement improper and cautioned the witness not to repeat it. Defense counsel did not request that the jury be instructed to disregard it, and it is not argued that the damage could not have been remedied by an instruction to disregard it; nor do we believe this to be the case, since the statement in question was an inadvertent and isolated reference. (See *People v. Christy* (1976), 43 Ill. App. 3d 1004, 358 N.E.2d 8.) Furthermore, the trial court's failure to instruct the jury to disregard the testimony, in the absence of a request therefor by defense counsel, does not make its refusal to grant a mistrial an abuse of discretion. *People v. Burage* (1961), 23 Ill. 2d 280, 178 N.E.2d 389, *cert. denied* (1962), 369 U.S. 808, 7 L. Ed. 2d 555, 82 S. Ct. 651.

Finally, defendant contends that he was denied a fair trial by the prosecutor's references to the threat testimony during rebuttal closing argument. He argues that statements which implied that, if released, defendant would kill the two prosecution witnesses, were inflammatory, irrelevant to the question of his guilt, and required the jury to return a verdict of guilty unless it was certain of his innocence.

While a prosecutor is permitted great latitude in his closing argument (*People v. Hine* (1980), 88 Ill. App. 3d 671, 410 N.E.2d 1017), including reference to threats made by the defendant if supported by the evidence (*People v. Fort* (1976), 44 Ill. App. 3d 62, 357 N.E.2d 1365) and invited by defense counsel's arguments (*People v. Atkins* (1976), 40 Ill. App. 3d 182, 350 N.E.2d 761), he may not "do or say anything in argument the only effect of which will be to inflame the passion or arouse the prejudices of the jury against the defendant without throwing any light upon the question for decision" (*People v. Galloway* (1956), 7 Ill. 2d 527, 533, 131 N.E.2d 474, 478). However, improper remarks do not require reversal unless they result in substantial prejudice to the defendant (*People v. Baptist* (1979), 76 Ill. 2d 19, 389 N.E.2d 1200); that is, unless they constitute such a material factor in the defendant's conviction (*People v. Satchell* (1981), 94 Ill. App. 3d 422, 418 N.E.2d 1063) that the verdict would have been different had the comments not been made (*People v. Singletary* (1979), 73 Ill. App. 3d 239, 391 N.E.2d 440).

■■■ The State maintains that its argument was merely a response to defendant's implication that the witnesses' delay in reporting this crime supported the inference that they fabricated their story in an attempt to divert suspicion from themselves. While it is true that we have found the State's reference to threats made by the defendant proper in analogous circumstances (*People v. Wallace* (1981), 100 Ill. App. 3d 424, 426 N.E.2d 1017; *People v. Randall* (1980), 84 Ill. App. 3d 888, 405 N.E.2d 1269), we believe that the prosecutor's argument here went beyond the bounds of fair reply, for we have found improper any implication that, if released, the defendant will kill a witness against him, recognizing that such argument inflames the jury without shedding any light on the issue of defendant's guilt or the credibility of the witnesses (*People v. Satchell* (1981), 94 Ill. App. 3d 422, 418 N.E.2d 1063). However, despite the impropriety of the prosecutor's remarks, reversal is not required in the instant case, for in the light of the whole record, it cannot be said that absent these comments the jury's verdict would have been different. Two witnesses who were well acquainted with defendant and had ample

opportunity to observe the crimes charged testified in detail to his involvement therein. Furthermore, the only other witness to the circumstances surrounding the crimes, while she did not identify defendant, did not negate the possibility of his involvement; in addition, the jury may well have found her testimony thoroughly impeached by her prior inconsistent statements regarding her observations. Finally, while defendant did present an alibi witness, her close familial relationship with defendant was a strong factor to be considered in assessing her credibility.

For the foregoing reasons, defendant's conviction is affirmed.

Affirmed.

WILSON, P.J., and LORENZ, J., concur.